# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## CENTRAL DIVISION

JOHN I. ANDERSON,          )
                                        )
        Plaintiff,        )
                                        )
        v.               )     Case No. 10-4244-CV-C-NKL-SSA
                                        )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,  )
                                        )
        Defendant.   )

## ORDER

Plaintiff John Anderson challenges the Social Security Commissioner's denial of his claim of disability and disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401 *et. seq.* and supplemental security income benefits, under Title XVI of the Act, 42 U.S.C. §§ 1381, *et. seq*.

Anderson argues that the Administrative Law Judge ("ALJ") improperly refused to give controlling weight to the medical opinions of two treating physicians, failed to seek necessary additional medical evidence from those physicians, and improperly discounted Anderson's credibility when assessing his subjective complaints of pain. Because the Court finds that there is not substantial evidence in the record to support the ALJ's decision, the Court reverses the denial of Anderson's benefits and remands with instruction to award benefits to Anderson.

1

## I.     Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1]  Anderson alleged that he became disabled on June 20, 2007, at the age of 48.  (Tr. 119).  According to his Disability Report, Anderson claimed disability based on a "bad back, ulcers, heart problems, depression, and problems with his neck, knee, and lungs.  (Tr. 124).

On February 19, 2008, Anderson presented to University of Missouri Hospital after reportedly falling off of a roof while working on his daughter's house  The hospital noted Anderson had a long history of self-mutilation and suicide attempts, and had once shot himself in the leg to get sympathy from his wife.  (Tr. 484).  He was admitted for observation.  (Tr. 491).  Anderson's mood appeared depressed, his speech was normal, his memory and cognition were "mildly" impaired, and his insight and judgment were appropriate.  (Tr. 487).  Anderson was diagnosed with depression and polysubstance abuse. (Tr. 490).  He was assigned a global assessment of functioning (GAF) score of 60.  (Tr. 490). An x-ray showed "mild" narrowing of the lumbosacral joint, no sclerosis, no bone destruction, his sacroiliac (SI) joints were normal, and his knee joints were "minimally" narrowed.  (Tr. 505).

On March 4, 2009, Anderson saw Susan Wittlich, P.A.-C, and Dr. Granberg.  (Tr. 356-58).  He complained of moderate pain in his neck radiating into his left arm, low back,

---

[1] Portions of the parties' briefs are adopted without quotation designated.

and left leg. (Tr. 356). He stated that medication provided 50 percent relief. (Tr. 356).

On March 17, 2009, Anderson was admitted to Hyland Behavioral Health after suicidal ideation and plans to cut himself to death. (Tr. 548-562). Anderson had tried to hang himself in August of 2007 but a friend cut him down. (Tr. 559). Anderson was diagnosed with moderate depression and assigned a GAF score of 30. (Tr. 560). He was discharged on March 19.

On April 3, 2009, Anderson saw Dr. Granberg with moderate pain in his low back and neck. (Tr. 359-61). He indicated 70 percent relief with medication. (Tr. 359).

Sarwath Bhattacharya, M.D., performed a physical consultative examination of Anderson on April 21, 2009. (Tr. 313-19). Anderson complained of depression, emphysema, pain in his neck and back, and hypertension. (Tr. 313). Anderson reported that his daily activities included watching television, doing laundry, light housework, and "some" grocery shopping and cooking. (Tr. 315). His gait was normal, and he had no difficulty getting on and off of the examination table, though his straight leg raises were slightly reduced. (Tr. 315). He had good range of motion in the extremities and spine, and his hand grips were 5/5. (Tr. 316, 318-19). The same day, Georgia Jones, M.D., diagnosed Anderson with major depressive disorder; depression, recurrent; personality disorder NOS; and chronic pain, and assigned him a GAF of 65-70. (Tr. 323).

On May 29, 2009, Anderson saw Dr. Granberg with pain in his back radiating through his left leg, and pain in his neck radiating through his left arm. (Tr. 362-64). He stated medication was not helping the pain. (Tr. 362). Dr. Granberg performed an occipital

nerve block procedure to treat Anderson's headaches. (Tr. 363, 379-80).

The following month, on June 10, 2009, Anderson saw Brice Windsor, D.O., for depression. (Tr. 411-13). Anderson reported last cutting himself in February 2007. (Tr. 411).

An x-ray of Anderson's chest dated June 12, 2009, was performed in response to his complaints regarding chronic obstructive pulmonary disease (COPD). (Tr. 520). No acute pulmonary process was seen. (Tr. 520). Magnetic resonance imaging (MRI) of Anderson's lumbar spine dated June 30, 2009, revealed mild levo-convex curvature of the lumbar spine with some mild spondylosis. (Tr. 377).

On July 9, 2009, Anderson returned to Dr. Windsor for hypertension and depression. (Tr. 414). Upon physical examination, Dr. Windsor noted Anderson's back was "normal," except that it was tender at his lower spine and at the left SI joint, with positive straight leg raises on the left. (Tr. 415). Computerized tomography (CT) images of Anderson's head dated July 13, 2009, showed no acute interacranial process, but a small left internal capsule lacunar infract. (Tr. 506).

Anderson saw Dr. Windsor again on July 22, 2009, and said he was "dizzy." (Tr. 417). Anderson also complained of chronic back pain and memory problems. (Tr. 417). An MRI of Anderson's lumbar spine dated July 22, 2009, showed mild spondylosis with a subtle right disc bulge, and a broad circumferential bulge at L5-S1 without additional gross compromise. (Tr. 378).

On August 5, 2009, Anderson saw Dennis Campbell, licensed psychologist, for

4

depression. (Tr. 533). Anderson reported having some "self cutting thoughts" that week after talking with his parole officer over the phone. (Tr. 533).

Anderson saw Dr. Windsor for degenerative joint disease on August 13, 2009. (Tr. 419). Physical examination revealed that Anderson's back was "normal" but "tender" in the lumbar area. (Tr. 419).

On August 21, 2009, Anderson saw Dr. Granberg with moderate pain in his neck and back. (Tr. 365-67). Anderson said he experienced 60 percent pain relief from the nerve block procedure at his previous visit. (Tr. 365). An MRI of Anderson's back revealed a left lateral disc bulge at L4-L5. (Tr. 365). Dr. Granberg performed an epidural steroid injection to treat Anderson's back pain. (Tr. 365, 381-82). Anderson returned to Dr. Granberg on September 18, 2009, with pain in his neck and headaches. (Tr. 368-70). Dr. Granberg performed an occipital nerve block to treat the headaches. (Tr. 368-69, 383-84).

On September 23, 2009, Anderson saw Dr. Windsor for depression and obstructive sleep apnea. (Tr. 421-24). Dr. Windsor noted that Anderson's depression was doing "well" overall. (Tr. 421). Anderson did not exhibit a depressed mood, irritability, crying, insomnia, feelings of worthlessness or guilt, or impaired concentration. (Tr. 421).

On October 7, 2009, Anderson returned to the Arthur Center for therapy with Mr. Campbell. (Tr. 532). Anderson reported that his "negative thoughts" continued, but said he did not have suicidal thoughts. (Tr. 532). His mood was euthymic, his thought flow logical, he was alert, and his memory was good. (Tr. 532). He was assigned a GAF of 65. (Tr. 532).

On November 11, 2009, Anderson saw Dr. Granberg and complained of pain in his

head, neck, and low back. (Tr. 371-73). Anderson reported 50 percent relief from medication and 50 percent relief from the occipital nerve block. (Tr. 371). He described the quality of his pain relief as "good." (Tr. 371). Dr. Granberg noted that Anderson's headaches were "fairly well controlled" with medication. (Tr. 371). Dr. Granberg performed an epidural steroid injection. (Tr. 372-73).

Anderson saw Dr. Windsor regarding migraines and obstructive sleep apnea on December 21, 2009. (Tr. 430). Anderson complained that his migraines had been under poor control for "a few days," and they were affecting his sleep. (Tr. 430). Anderson reported they began after he "got in a fight." (Tr. 430). Dr. Windsor increased his medication because of Anderson's recent trauma. (Tr. 432).

On December 30, 2009, Anderson saw Mr. Campbell and reported having some reduction of thoughts of self harm. (Tr. 534). Anderson felt his medication was helping. (Tr. 534). Mr. Campbell noted that Anderson was "not cutting for several months." (Tr. 534).

On January 6, 2010, Anderson complained of severe pain in his neck and back to Dr. Granberg. (Tr. 374). Anderson indicated that medication provided only approximately 30 percent relief. (Tr. 374). He reported feeling relief after his first epidural steroid injection, and Dr. Granberg performed another. (Tr. 374-76, 387-88).

Later that month, on January 27, 2010, Anderson returned to Mr. Campbell for depression. (Tr. 535). Anderson said he continued to have thoughts of cutting on a regular basis, but he was continually able to distract himself and self-soothe. (Tr. 535).

6

Several months later, on March 2, 2010, Mr. Campbell completed a Mental Medical Assessment for Anderson. (Tr. 536). Campbell determined Anderson had a "fair" ability to follow work rules, function independently, and maintain attention and concentration. (Tr. 536). According to Mr. Campbell, Anderson had "poor to no[]" ability to relate to coworkers, deal with the public, use judgment, interact with supervisors, or deal with work stress. (Tr. 536). Anderson had a "fair" ability to understand, remember, and carry out complex job instructions, a "good" ability to maintain personal appearance, and "poor to no[]" ability to behave in an emotionally stable manner, relate predictably in social situations, or demonstrate reliability. (Tr. 537).

On March 3, 2010, Dr. Granberg prepared a letter stating that Anderson had a chronic condition, and flare-ups may require one to three absences from work each month. (Tr. 538).

On March 18, 2010, Anderson saw Dr. Windsor and complained of severe pain in his low back and left leg that had been present for one day. (Tr. 612). Anderson reported being unable to walk or move much without pain in his back and leg. (Tr. 614). Dr. Windsor admitted Anderson for care. (Tr. 617). An x-ray of Anderson's cervical spine showed probable bony infraction at the humerus and prominent cervical spondylosis. (Tr. 620). An x-ray of his left shoulder revealed no acute osseous abnormality. (Tr. 622). An MRI of his cervical spine showed a "small" right paracentral disc extending inferiorly that did not efface the cord at C3-4, a small central disc that did not efface the cord at C4-5, "mild" narrowing with "minimal" disc bulge at C5-6, and no large disc protrusion was seen with the cord of normal size and signal. (Tr. 626). An x-ray of his lumbar spine showed "mild"

7

levoscoliosis, but was otherwise unremarkable. (Tr. 627). An MRI of his lumbar spine showed a right paracentral disc protrusion at T12-L1 and a high intensity zone at the posterior L5-S1 disc. (Tr. 628). He was diagnosed with sciatica and restricted to a walker at all times with lifting as tolerated. (Tr. 607).

Anderson testified at a hearing before the ALJ on February 12, 2010. (Tr. 24). He said he had a ninth-grade education, and had no additional vocational training or education. (Tr. 29). Anderson testified he was unable to work because of pain in his back and head, and because of his mental status. (Tr. 30). He said he could lift no more than 10 pounds, and that he had neck pain that was present all day. (Tr. 32-33). He also reported having migraine headaches once or twice a day. (Tr. 33). Anderson said he saw a psychiatrist for his cutting, and that he had trouble getting along with people and problems with concentration. (Tr. 34-35). Anderson reportedly spent his days laying down, watching television, washing dishes, vacuuming, and making his bed. (Tr. 36).

A vocational expert also testified at the hearing. (Tr. 37-42). In response to a hypothetical about Anderson's impairments, the vocational expert responded that the hypothetical individual, as described by the ALJ, could work as a coin machine collector (700 jobs in Missouri and 21,100 jobs nationally), merchandise marker (27,200 jobs in Missouri and 1,548,100 jobs nationally), or collator operator (1,100 jobs in Missouri and 118,200 jobs nationally). (Tr. 39).

## II.     Discussion

In reviewing a denial of disability benefits, the Court considers whether the ALJ's

decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). Anderson argues that the ALJ improperly gave only little weight to the medical opinions of Dr. Granberg, a pain specialist who has treated Anderson since 2006, and Mr. Campbell, a licensed psychologist who saw Anderson three times. "ALJs are not obliged to defer to treating physician's medical opinions unless they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record." *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008) (internal quotes omitted). But an ALJ can only reject medical evidence "based on contradicting medical evidence, not on the ALJ's own judgments or opinions." *Id.*

The ALJ provided several reasons for giving little weight to Dr. Granberg's opinion. The ALJ first noted that Dr. Granberg's treatment notes did not support Dr. Granberg's conclusion that Anderson would monthly miss one to three days of work. The ALJ specifically found that Dr. Granberg only administered his prescribed treatment to Anderson for flare-ups on five occasions throughout the record and that Anderson often went for months at a time without seeing Dr. Granberg (including a thirteen-month gap in treatment from February 2008 to March 2009).

However, even if there is substantial evidence in the record to reject Dr. Granberg's conlcusion that Anderson would not miss one to three days of work per month, there is substantial evidence that Anderson over a long period of time sought treatment for his back and was regularly prescribed pain killers. Therefore, the ALJ's conclusion that Dr.

9

Granberg's opinion is entitled to little weight is not supported by this record as a whole. Specifically, several MRIs indicate conditions such as degenerative changes, spondylosis, and lateral bulges, and examining doctors noted tenderness during examinations. The Commissioner points out that where observed, these conditions were generally characterized by physicians as "small," "mild," or "minimal. However, the objective findings in Anderson's file consistently show documented complications in Anderson's spine. It is not for the ALJ to seize upon the terms "small," "mild," or "minimal" and conclude that they indicate abnormalities that do not interfere with Anderson's ability to be active. If the ALJ is going to interpret what mild means medically contrary to Dr. Granberg's assessment, the ALJ needs another medical expert, or some other reliable evidence, that mild impingement means mild impact on Anderson's functioning. On this record, there is not substantial evidence to support his finding that Dr. Granberg's assessment should be given little weight because of the reference to "mild" or "small".

The ALJ further noted that Dr. Granberg's conclusions were contradicted by evidence in the record that Anderson's pain is largely controlled by medication. However, because Anderson "often" reported 50-60% relief from medication and "[a]t times" reported 20-30% relief, "[i]t is obvious from the records that pain still persists." The Commissioner relies on reports of 50% pain relief, as well as reports of "near complete relief" [Tr. at 244], up to 80% pain relief [Tr. 314], and Dr. Granberg's conclusion that Anderson's headaches were "fairly well controlled" [Tr. 371], to support the ALJ's determination. However, all this evidence supports the conclusion that Anderson was almost always in some level of pain.

10

Therefore there is not substantial evidence in the record to support the ALJ's finding that Anderson's pain was largely controlled by medication.

Finally, the ALJ noted that Dr. Granberg did not indicate any specific limitations for Anderson. In contrast, the ALJ referenced Dr. Windsor's recommendation in January 2010 that Anderson walk four times a week and engage in light activity as suggesting Anderson had greater functionality than that observed by Dr. Granberg. But once again, Dr. Windsor's suggestion that Anderson walk for exercise <u>when able</u> is not inconsistent with Dr. Granberg's assessments. There is no evidence in the record that he was *able* to walk four times a week. Further, being able to walk four times a week does not show that Anderson could engage in full-time employment on a consistent basis.

The ALJ also erred by finding that Anderson's daily living activities – watching television, vacuuming, unloading the dishwasher, preparing frozen dinners, shopping, and visiting family members – demonstrated that Anderson was not being truthful about his limitations. Anderson cites *Rainey* for the proposition that activities such as doing dishes, light cooking, and driving to shop for groceries are not substantial evidence of the ability to engage in full-time work. *Rainey v. Dep't. of Health & Human Servs.,* 48 F.3d 292, 293 (8th Cir. 1995). And the Eight Circuit clarified in *Edwards* that the *Rainey* court's "concern was that the ALJ failed to explain the inconsistencies between the claimants' activities and their subjective complaints." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Here, as in *Rainey*, the ALJ did not explain which of Anderson's daily activities contradicted his claimed limitations and why. Further, the daily activities of the claimant in *Edwards* appear

11

more strenuous than those engaged in by Anderson. The ALJ improperly discounted Anderson's subjective complaints of pain on this basis.

More importantly, Anderson argues the ALJ erred in giving little weight to the opinion of Dennis Campbell, a licensed psychologist who saw Anderson for three sessions before preparing his opinion that Anderson would have a very difficult challenge in making interpersonal adjustments. The parties agree that the ALJ erred in concluding that Mr. Campbell, because he had only his master's degree and not a doctorate degree, was not an acceptable medical source under 20 C.F.R. § 404.1513(a)(2).

The Commissioner argues that the ALJ's error is harmless. First, because Campbell only saw Anderson three times before rendering his medical opinion, the Commissioner argues that Campbell's opinion is not entitled to controlling weight as that of a treating physician. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) (finding substantial evidence for ALJ's refusal to give controlling weight to a treating doctor's opinion, in part because the doctor had only seen the claimant for depression three times). Further, the ALJ considered Campbell's conclusions inconsistent with the medical record, including Anderson's global assessment functioning score ranging between 65 and 70 (indicating only mild symptoms), Dr. Windsor's assessment that Anderson was doing well with his depression, the Arthur Center notes describing Anderson's mood as "euthymic" (non-depressed), and Campbell's own assessment that medication was helping and that Anderson had fewer thoughts of self-harm. Finally, the Commissioner argues that the ALJ's residual functional capacity was "largely consistent" with Mr. Campbell's findings because it

12

included, for example, a finding that Anderson could not work around the general public or work closely with coworkers.

The Court is not convinced that the ALJ's error in finding Campbell to not be an acceptable medical source under the Act was harmless. It is because Dr. Campbell's opinion contradicted the evidence relied on by the ALJ that the ALJ's mistake is troubling. Further, the contradictory evidence relied on by the ALJ mostly comprises isolated comments throughout Anderson's medical records, where those records more consistently show severe depression and significant struggles with self-mutilation, including suicidal thoughts and actions. If Dr. Campbell's testimony were considered there would not be substantial evidence in the record to support the ALJ's conclusion that Anderson could work a job in a competitive economy eight hours a day, five days a week on a consistent basis, particularly in combination with Anderson's consistent history of back problems.

The ALJ relied heavily for his decision on isolated comments downplaying the effects of Anderson's impairments. This was improper. *See Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989) ("In determining whether the Secretary's decision is supported by substantial evidence on the record as a whole, the court must take into consideration the weight of the evidence in the record both for and against the conclusion reached."). The great weight of evidence on the record shows Anderson had objective symptoms of physical pain that Dr. Granberg concluded would impact his ability to work. Further, the great weight of evidence shows Anderson consistently suffered from depression, self-cutting and suicidal thoughts and actions which Mr. Campbell concluded would make adjusting to the workplace extremely

13

difficult for Anderson.

While the ALJ clearly erred in discounting Dr. Campbell's opinion, a remand is not necessary because considering the record as a whole, including Dr. Campbell's testimony, there is not substantial evidence to support the ALJ's conclusion that Anderson is not disabled.

**III.    Conclusion**

Accordingly, it is hereby ORDERED that John Anderson's Petition [Doc. # 3] is GRANTED.  The decision of the ALJ is REVERSED with instruction to award benefits.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: October 21, 2011
Jefferson City, Missouri